Katie A. Gummer, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey  07102
(973) 622-4444
KG-1349

Kenneth E. Keller (CSBN 71450) (admitted *pro hac vice*)
Anne E. Kearns (CSBN 183336) (admitted *pro hac vice*)
Krieg, Keller, Sloan, Reilley & Roman, LLP
114 Sansome Street
Fourth Floor
San Francisco, CA 94114
(415) 249-8330

Attorneys for Defendant
Intouch Group, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BACHMANN SOFTWARE & SERVICES, LLC | Civil Action No. 2025-08 (KSH) |
| Plaintiff, | **AFFIDAVIT OF JOSHUA KAPLAN IN SUPPORT OF DEFENDANT INTOUCH GROUP, INC.'S MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER** |
| v. | |
| INTOUCH GROUP, INC., | |
| Defendant. | |

STATE OF CALIFORNIA :
                                    : ss.
COUNTY OF ALAMEDA :

      **JOSHUA KAPLAN,** of full age, being duly sworn according to law, upon his oath, deposes and says:

      1.    I am the Chairman, CEO, and founder of Defendant Intouch Group, Inc. ("Intouch"). I am fully familiar with the facts set forth herein, and submit this Affidavit in support of Intouch's Motion To Dismiss Complain For Lack of Jurisdiction (FRCP 12(B)(2)), or in the Alternative to Transfer for Want of Jurisdiction (28 U.S.C. § 1631), or in the Alternative to Transfer for Convenience (28 U.S.C. §1404(A)).

      2.    Intouch was incorporated on June 29, 1990 in California, with its principal place of business in Berkeley, California. From 1990 until 2006, Intouch was in the digital music business. After exiting the music business in 2006, Intouch began developing "iBrowz", its mobile phone software application. Intouch's most recent development effort focuses on cutting-edge and state of the art software and applications for connected mobile phones that enable content providers and advertisers to effectively access a digital mobile market. Intouch has thus been involved in the design and development of a unique and innovative software application, the Intouch iBrowz System ("iBrowz"), which will be a new custom phone application designed specifically for mobile phone devices. iBrowz will

provide "smart phone" users with a customized (based on user preferences and behavior) advertising - supported browsing experience that will allow users to browse the Internet from their mobile device in a manner that is easier to use, easier to read and with better performance than existing mobile browser solutions.

3.     Intouch has never advertised itself or its services in any publication directed specifically at New Jersey.  Intouch does not regularly conduct business in New Jersey or receive revenues from business activities in New Jersey. While Intouch may have visited New Jersey ten years ago for business "prospecting" while it was in the music business, no business ever resulted from those visits. Intouch is no longer in the music business, and has not been in that business for over 5 years.

4.     Intouch is not incorporated in New Jersey, nor has it qualified to do business in New Jersey.  Intouch has no subsidiaries incorporated or qualified to do business in New Jersey.  Moreover, none of Intouch's officers, directors or employees reside or are domiciled in New Jersey.  Intouch has no branch office or comparable facilities in New Jersey, and has no telephone listings or mailing addresses in New Jersey.  Intouch has no bank accounts or other tangible personal or real property in New Jersey.  Intouch has never held any of its board of director's or shareholder's meetings in New Jersey.  Intouch has never done business with any other third party in New Jersey.

5.     A true and correct copy of the March 8, 2007 Agreement (produced by Bachmann during jurisdictional discovery in this litigation) is attached hereto as Exhibit A.

6.     A true and correct copy of Exhibit B to the March 8, 2007 Agreement (produced by Bachmann during jurisdictional discovery in this litigation) is attached hereto as Exhibit B.

7.     Beginning in about July 2007, the parties decided to restructure the way Bachmann would provide his services to Intouch.  Intouch found it necessary to restructure the March 8, 2007 Agreement due to problems it was experiencing with Bachmann, and its need to more closely manage Bachmann. Bachmann had missed deadline after deadline, and had caused Intouch to miss its initial June, 2007 launch date.  While, Intouch began looking for other developers to replace Bachmann (and did in fact hire such a developer Beom "Brian" Chae" in October, 2007), Intouch needed to maintain its relationship with Bachmann for consistency and to allow for a successful transition to its own employees.  Intouch thus discussed a new agreement with Bachmann.

8.     Specifically, the parties envisioned that Bachmann would provide short development services in a series of 3 week "sprints." Given the new and unique structure of the agreement and payment plan, it took the parties a few months to negotiate the agreement into a final written contract.

3

9.    A true and correct copy of the October 24, 2007 Agreement (produced by Bachmann during jurisdictional discovery in this litigation) is attached hereto as Exhibit C.

10.    Intouch signed the new October 24, 2007 Agreement, under duress, so avoid losing additional time on development of iBrowz.

11.    Bachmann regularly transmitted source code to Intouch's California-based code repository beginning in about November, 2007 (albeit such code was faulty, inadequate, dysfunctional, and laden with bugs, and caused Intouch countless hours and labor to fix and overhaul it). In many instances, Bachmann transmitted additional source code in an often unsuccessful attempt to fix those bugs, which had to again be rewritten by Intouch. It is estimated, by looking at the repository deposit log, that Bachmann transmitted code into Intouch's California repository on at least 150 occasions.

12.    During the course of Bachmann's relationship with Intouch, Bachmann emailed invoices to Intouch in California, which could have been accomplished from any location. Upon information and belief, Mr. Bachmann personally handed a few invoices to Intouch during his visits to California.

13.    On at least two occasions, Intouch paid Mr. Bachmann in person while he was visiting Intouch's offices in California. One was on or about July 18, 2007 and the other was on or about October 24, 2007.

14.    Although the Agreement was not e-signed until late October, 2007, Bachmann began working under the new "sprint" structure as early as July 2007.  In fact, on July 16-18, 2007, Mr. Bachmann visited Intouch in California and attended a routine team interaction/planning and technical support meeting for meeting with visitors from a company called CIE.  While Mr. Bachmann was there, Intouch gave Mr. Bachmann a check for past services.

15.    Just as the parties contemplated and planned, Mr. Bachmann visited Intouch in California an additional six more occasions to provide services, to attend team and "SCRUM" meetings, to provide "programming" and other software development services, and to attempt to "debug" and/or fix the faulty services and products he had previously provided to Intouch, among other things.

16.    The next visit, which occurred between August 7-9, 2007, Mr. Bachmann attended a routine team interaction/planning session and technical support for a visit from a company called Spice Networks.  The next visit occurred between September 9-11, 2007, during which time Mr. Bachmann attended a routine team interaction and planning session.  The fourth visit occurred on September 28-29, 2007 during which time Mr. Bachmann attended another team interaction and planning session.  During all of these visits to California, Mr. Bachmann, Mr. Schlessinger, and other Intouch employees, discussed and further negotiated the terms of what would become the October 24, 2007 Agreement.

17.    On Mr. Bachmann's next visit, which occurred on October 21-24, 2007, he attended a routine interaction/planning meeting and tech support at a CTIA conference. It was during this visit that the parties finalized the October 24, 2007 Agreement. In addition, during this visit to California, Intouch personally delivered a check to Mr. Bachmann for past services.

18.    The next meeting occurred between November 18-20, 2007, during which time Mr. Bachmann attended a routine team interaction/planning meeting. The last visit occurred between December 10-11, 2007, where Mr. Bachmann again attended a routine team interaction and planning meeting.

19.    While visiting Intouch on those seven separate occasions, Mr. Bachmann used Intouch's facilities as well as his own laptop to perform a significant amount of "work" for Intouch (*e.g.*, programming, fixing bugs). It was understood that Bachmann would "perform services" under the October 24, 2007 Agreement from *any* location using his laptop computer provided that the laptop has the appropriate software applications for the work and a mechanism for connecting to a remote server or to the Internet (*e.g.*, either via a physical cable connection or wireless link).

20.    Upon information and belief on at least one occasion, Mr. Bachmann indicated to Intouch that he would be "performing services" for Intouch while he was on location for another out-of-state client.

21.    The services and "products" (*e.g.,* source code) provided by
Bachmann to Intouch over the course of their entire relationship were incomplete,
inadequate, dysfunctional, faulty and/or contained numerous bugs that required
Intouch to fix and substantially overhaul, to the great expense and detriment of
Intouch.

22.    In fact, due to the iBrowz software crashing and failing to
perform on nearly every demonstration to potential customers, business alliances,
and/or investors, Intouch had to stop demonstrating the application itself, and could
only provide screen-shots of the application through a PowerPoint presentation or
play a YouTube video that Intouch made and edited, to avoid showing the bugs and
crashes.   Moreover, much of the iBrowz application that was ultimately either
shown to or substantively discussed with third parties differed substantially from
what Bachmann provided to Intouch.

23.    All but a few of the potential customers, business alliances,
and/or investors that Intouch showed or substantively discussed iBrowz with are
located in California.  The version of iBrowz that Intouch showed to these third
parties was significantly different from what Bachmann initially provided.
Additional witnesses, also located in California, include Intouch employees and
consultants who negotiated the contracts at issue, who communicated with

7

Bachmann about his services, and who witnessed, fixed, over-hauled, and rewrote Bachmann's faulty code.

24.     As a result of Bachmann's bug laden and faulty code, which rendered it non-functional, Intouch did not accept the last three sprints (Sprints 8, 9, and 10). Given that the sprints were never accepted, payment for those sprints did not become due. Rather, Intouch spent at least $80,000 engaging additional engineering staff to correct Bachmann's shoddy work that Bachmann should have completed. Intouch attempted to resolve the issue with Bachmann, offering Bachmann to continue to work on Sprints 8, 9, and 10 and be paid an additional $35,000 when all code was delivered bug free. Bachmann rejected this offer.

_____
Joshua Kaplan

Subscribed and sworn to
before me this 26th day
of June, 2008



87843                                           8

EXHIBIT A

# DEVELOPMENT AGREEMENT

This Development Agreement ("Agreement"), dated as of the 28 day of February 2006, by and between intouch group ("Client"), a California corporation, and Bachmann Software & Services, LLC, a New Jersey limited liability company ("Bachmann").

## RECITALS

WHEREAS, Bachmann is in the business of providing software development services to third parties; and

WHEREAS, Client and Bachmann desire that Bachmann provide certain software development services to Client;

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, the parties hereto agree as follows:

1.      **Services**

Bachmann agrees to provide the services described in attached Exhibit A (the "Services") in accordance with the provisions set forth herein and in Exhibit A. In the event that there is a conflict or ambiguity between Exhibit A and this Agreement, this Agreement controls.

2.      **Fees and Expenses**

Client shall pay Bachmann the fees and expenses described on Exhibit A. No other fees and expenses shall be charged to or payable by Client in connection with the Services, except solely that Client shall reimburse Bachmann for any extraordinary out-of-pocket expenses not currently contemplated by the parties and which Bachmann incurs in connection with the Services after obtaining Client' prior written approval for such extraordinary expenses. Bachmann shall submit timely invoices detailing such expenses and shall submit receipts for all such expenses.

3.      **Work for Hire**

All right, title and interest in and to all work product created by Bachmann and its employees, agents and subcontractors, including, without limitation, software code (source code and object code), documentation, studies, specifications, consumer and product data, new products or parts, plans, ideas, inventions, research, designs, enhancements, graphic and electronic productions, engineering results, and all directly related know-how, technical information and trade secrets, and any other matters and/or materials created, compiled or developed by Bachmann in connection with the Services or provided to Client by Bachmann in connection with the Services (collectively, the

Send. Sign. Done. ———— EchoSign. Signed: 2007-03-08

BACHMANN9

"Materials") will for all purposes be exclusively vested in Client. Bachmann acknowledges that the Materials are "work made for hire", and to the extent Client does not become the exclusive owner of the Materials by operation of law, hereby grants and assigns to Client all right, title and interest it may have in and to the Materials, without reservation or restriction, including but not limited to, the right to use, patent, copyright, trademark, market, license, release, sell, distribute, promote, advertise and otherwise exploit all or part of the Materials, and any other products made or processes derived there from, and to refrain from doing any or all of the foregoing. In furtherance thereof and at no charge to Client, Bachmann agrees: (i) upon Client' written request, to communicate and assign (and will require all of its employees, agents and subcontractors to communicate and assign) to Client all right, title and interest in and to the Materials, including without limitation, all patents, copyrights, trademarks, trade secrets, inventions and discoveries developed in the performance of the Services, (ii) to execute and deliver to Client such additional documents as Client reasonably requests as necessary to more fully vest in Client all right, title and interest in the Materials and to evidence that no other person has any claim thereto, and (iii) to require all personnel working on the provision of the Services hereunder, to enter into a written agreement with Bachmann giving Bachmann the full right, title and interest in and to all the results, tangible and intangible of such work, with Client being a stated third party beneficiary to such agreement and authorized to enforce such agreement directly. Bachmann shall obtain releases, licenses, permits or other authorizations required or appropriate for the use by Client on a worldwide basis on any media of all photographs, copyrighted materials, artwork or any other property or rights belonging to third parties obtained by Bachmann for use in performing Services for Client. The provisions of this paragraph shall survive the termination or expiration of this Agreement.

4.     **Compensation**

Client agrees to pay Bachmann the compensation set forth in the Statement of Work. Bachmann shall submit invoices to Client monthly for the services furnished and other expenses incurred hereunder. Client shall pay each invoice in full within thirty (30) days after receipt.

5.     **Representations, Warranties and Covenants**

Bachmann hereby represents and warrants to Client that as of the date hereof and at all times while providing the Services and while any of its obligations hereunder remain in effect, that it has full legal capacity, right and authority to enter into this Agreement, provide the Client with the assignments and rights provided for herein (and has written enforceable agreements with all persons necessary to give it the rights to do the foregoing and otherwise fully perform this Agreement) and to provide the Services hereunder without violation of or conflict with any other agreement or instrument to which it is a party or by which it, the Materials or the Services may be bound or subject.

Except as set forth herein and in Exhibit A with respect to the Services, neither Bachmann nor Client makes any representations or warranties of any kind specifically disclaiming any warranties of merchantability or fitness for a particular purpose. In no event shall either party be liable to the other party for any special, incidental (other than direct) or consequential damages or lost profits even if advised of such fact in advance.

6.     **Indemnification**

Bachmann hereby agrees to indemnify, defend, and hold Client and its successors, assigns, owners, officers, directors, employees, shareholders, representatives, and agents harmless from and against any and all claims, liabilities, losses, costs, damages or expenses (including reasonable attorneys' fees, expert witness fees, legal expenses and costs) lawsuits and other judicial proceedings whether in contract, tort, or both arising from or in any manner connected with (i) Bachmann's provision of the Services, (ii) a breach by Bachmann of its representations and warranties hereunder, or (iii) any action brought by a third party asserting infringement of copyright, patent or trade secret or other third party proprietary rights by the Services or Materials. The provisions of this paragraph shall survive the termination or expiration of this Agreement.

7.     **Confidentiality**

Bachmann acknowledges and agrees that Client is entitled to prevent the disclosure of Trade Secrets. Bachmann agrees, for itself and each person providing Services hereunder on behalf of Bachmann, at all times while providing Services for Client hereunder and at all times thereafter to hold in strictest confidence, limit access to, and not to disclose or allow to be disclosed to any person, firm or corporation, and not to use, except as may be necessary in rendering Services to Client, whether directly or indirectly, any Trade Secrets, without the prior written consent of a duly authorized representative of Client. For purposes of this Agreement "Trade Secrets" shall include (i) all information provided by Client to Bachmann in connection with the Services, and (ii) all Materials. The provisions of this paragraph shall survive the termination or expiration of this Agreement.

8.     **Governing Law**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California without reference to the law of conflicts of laws thereof.

9.     **Independent Contractor Status**

The parties intend that Bachmann shall act as an independent contractor in performing the Services under this Agreement. Bachmann has no express, implied or apparent authority to make commitments on behalf of Client pursuant to this Agreement. Bachmann shall be responsible for all taxes arising from the development fees paid to Bachmann hereunder. Bachmann acknowledges and agrees that, as an independent contractor of Client, it is not entitled to share in any employee benefits of Client whether pursuant to

this Agreement or otherwise, nor shall it be entitled, except as specifically provided herein, to participate in any plans, programs or arrangements offered, or which may in the future be provided, by Client to its employees. Bachmann shall be solely responsible for all wages, salaries, benefits of its employees, and for all employment and self-employment taxes and for insurance coverage.

10.     <u>Assignability</u>.  It is understood that the Services provided hereunder are to be provided by Bachmann.  Therefore, Bachmann may not assign, transfer or sell its rights under this Agreement or delegate its duties hereunder without Client's prior express written consent.  Any attempted assignment or delegation without such consent shall be void and without effect.

11.     **Notices**

All notices or communications hereunder shall be in writing, addressed as follows:

> To Client:
> > intouch group
> > 1003 Camelia Street
> > Berkeley CA  94710
> > Attn: Joe Schlessinger
>
> To Bachmann:
>
> > Bachmann Software & Services, LLC
> > 270 Sparta Avenue, Suite 104-318
> > Sparta, New Jersey 07871
> > Attention:  Glenn Bachmann

All such notices shall be conclusively deemed to be received and shall be effective, (a) if sent by hand delivery or courier service, upon receipt, (b) if sent by telecopy or facsimile transmission, upon confirmation of receipt by the sender of such transmission or (c) if sent by registered or certified mail, return receipt requested, on the fifth day after the day on which such notice is mailed.  Either party may change the address provided for that party above by giving notice to the other party in the manner prescribed in this Section.

12.     **Termination**

Client shall have the right to terminate the Services upon ten (10) business days prior written notice to Bachmann.  Upon such notice of termination (i) Bachmann shall cooperate with Client to wind down, and to the extent applicable, transition the Services and the Materials, (ii) Client shall pay to Bachmann any amounts not previously paid for the Project Fee and all additional compensation, if any, then due to Bachmann for Services rendered through the date of termination, (ii) all Materials (as defined) and any other material prepared, used or delivered by Client to Bachmann or in Bachmann's possession or control, whether or not approved by Client, shall become and remain

Client' property, and Client may use such Materials as Client deems necessary or desirable, without any obligation or responsibility to Bachmann, (iii) Bachmann shall immediately deliver to Client, or if so instructed by Client, destroy all tangible and electronic embodiments of Trade Secrets (as defined) then in its possession or control or for which Bachmann is responsible, whether written or contained on any tape, disk or other storage or retrieval medium, including all copies and derivative material.

13.    Acceptance

Milestone progress payments shall be made to Bachmann by the Client according to the payment schedule in Appendix A and upon acceptance by Client of the milestone. . Payment shall not be unreasonably withheld by Client.

The milestones schedule, acceptance criteria, and defect remedy procedures are detailed in the Statement of Work in Appendix A.

14.    **Entire Agreement**

This Agreement represents the entire agreement of the parties, and shall supersede any and all previous contracts, arrangements or understandings between Client and Bachmann, with respect to the subject matter hereof.  This Agreement may be amended at any time by mutual written agreement executed by the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CLIENT

By:_____ Original Signed by J. D. Kaplan_____

    Name: Josh Kaplan
    Title: President
    Company: intouch group

BACHMANN SOFTWARE AND SERVICES, LLC

By:_____

    Name:
    Title:

Exhibit A: Statement of Work



# iBrowz Statement of Work
**Glenn Bachmann**
**Bachmann Handheld Solutions**
**Revision Date: 02/27/2007**

## 1. Introduction

This document presents a statement of work which covers the development of InTouch's iBrowz, a new custom web/content browser product designed specifically for smart phone mobile devices.

This proposal will cover the following areas:

- Product charter
- Target device models
- Functional Specification and User Experience
- Development Plan
- Cost and Payment Schedule

## 2. Product Charter

The iBrowz product concept provides smart phone users with a customized web browser experience that offers the following key advantages over the built-in web browser provided on today's mobile devices:

- Fast viewing and navigation of favorite web sites
- Automatic background updates ensure that content is always current
- Content is retained locally for offline viewing

These advantages are attained by creating a specialized client application which runs on the device. This device application leverages an InTouch proxy server which performs much of the "heavy lifting" and content simplification ("filtering") required to create a best-fit browsing experience given the limitations of smart phone screens and bandwidth.

In the iBrowz model, selected web content is pre-fetched to the device and stored on a SanDisk Gruvi SD card. This pre-fetching is performed in the background by the iBrowz client application according to a predefined schedule. Once this content is stored on the SD card, the user may view and navigate the local content using a web viewer/browser.

## 3. Target Devices and Platform

InTouch has stated that ultimately the following devices/platforms are to be targeted.

- RIM BlackBerry
- Palm Treo (Palm OS)
- Palm Treo 700w (Windows Mobile)
- Symbian (Series 60 and UIQ)
- Java Phones (MIDP)

The first version of iBrowz will specifically target the Palm Treo 700w (Windows Mobile). By this we mean that the application will assume a Windows Mobile 5.x device, as well as the 700w's screen dimensions, keyboard, and 5-way navigation.

**Windows Mobile 5 and Treo W compatibility**

The code developed for the Treo 700w shall be binary compatible with Windows Mobile 5. Portions of the application may be optimized for specific areas unique to the Treo 700w. It should be noted that while the iBrowz code will be generally compatible with other PDAs and smartphones running Windows Mobile 5, it may require additional minor customization to work acceptably on devices with slightly different screen dimensions, navigation hardware, or other variations. These customizations are not included in the time / cost figures in this statement of work.

**Porting to Additional Platforms**

Once the iBrowz WM5/Treo 700w application development effort has completed, we can adapt (port) the code base to other device platforms. In general we try to the extent possible to anticipate the need for adaptation on all projects, and we architect/structure the code we write so as to minimize the effort required. While this does not reduce the porting effort to a trivial one, it does significantly reduce the cost from simply being a duplicate of the original coding effort, to instead costing something in the area of 40% to 60% of the original effort. The cost of porting to these platforms is not included in the time / cost figures in this statement of work.

## 4. Functional Specification

This section describes the server and handheld components which make up the iBrowz solution. This statement of work focuses on the handheld and synchronization functionality, however we have included descriptions of the server-based components for completeness as they are referenced in various places within the handheld iBrowz functional description.

For the handheld and synchronization components, this section also provides a description of how each component will perform its functions and interact with the handheld device user.

### 4.1. Server Components

BACHMANN16

The following server components will handled content retrieval, filtering/translation, and user registration on behalf of the iBrowz user. These components shall be developed by InTouch.

**Poller/Filter Server**

The Poller/Filter Server will be developed and maintained by InTouch, and will be responsible for retrieving, filtering and populating web content on the InTouch servers based on its knowledgebase and a schedule. The Poller/Filter Server does not interface directly with the iBrowz handheld client application.

**Proxy Server**

The Proxy Server will be developed and maintained by InTouch, and is responsible for handling requests from the iBrowz client application (on the device or desktop) for updated content based on the user's profile and web site "subscriptions".

Content shall be pre-translated, filtered and packaged prior to delivery to the handheld, resulting in a set of web content which can be stored and browsed in-place on an inserted SD card by a Pocket Internet Explorer component on the device. Content delivered to the device will be formatted in a manner conducive to a reasonable browsing experience on the handheld device.

**Registration Server**

The Registration Server will be developed and maintained by InTouch and will be responsible for storing and accepting registration requests from the handheld client application or desktop.

## 4.2. Handheld / Desktop Components

The following components shall run on the user's handheld and desktop and as such will provide the end-user's iBrowz experience as well as manage the automatic updating of subscribed content. These components shall be developed by Bachmann Software.

**iBrowz Installer**

A Windows Mobile 5 installer component shall be developed such that it will automatically launch upon insertion of an SD card containing the component. The installer component will be responsible for any initial bootstrap setup of iBrowz on the device, including injection of iBrowz links into the devices IE Favorites database. It will also launch the 1st Time User sequence which includes registration.

**iBrowz Handheld Client Application**

The iBrowz Handheld Client (aka "The Shell") is a Windows Mobile 5 application which provides the user with access to content browsing functionality in the form of an embedded/integrated IE component. It also provides the user with program configuration options, and visuals/icons which help to "brand" the browsing experience as a premium InTouch feature. To the user, this component is iBrowz, and it presents itself as a standard Windows Mobile application with program icon, start menu shortcut, etc.

**iMessenger**

The iMessenger component is a Windows Mobile 5 component which connects to the InTouch proxy server and retrieves content updates in the background according to a schedule. These updates are decompressed and stored on the SD card where they may be accessed by iBrowz.

**iBrowz Synchronization Agent**

The Sync Agent is a Windows Desktop application which contains an implementation of iMessenger (adapted for the Windows Desktop) and which is similarly capable of retrieving content updates from the Proxy Server. For handhelds which do not directly connect wirelessly to the proxy Server, the Sync Agent also is responsible for transferring content updates from the desktop o the device over the synchronization cable. This transfer is triggered by ActiveSync when the device is connected.
*GB: How does the user obtain the desktop component?*

**Pocket Internet Explorer**

The preferred way for the end user to access iBrowz content shall be through the iBrowz Handheld Client (the "Shell"), which will incorporate an embedded version of IE for rendering content within the iBrowz application itself. Encouraging the use of the iBrowz application will reinforce the iBrowz/InTouch brand, and will also provide a consistent look and feel for the user's browsing and configuration experience.

However, it has been stated as desirable for the end user to also access iBrowz local SD content from within a standard Internet Explorer session. This shall be done via an inserted "Favorite" link, which will point the user to the local SD-resident "home page". Note that if the user accesses iBrowz content in this way, the user will not necessarily have direct access to the iBrowz shell or configuration options from within IE, nor will the iBrowze icon/indicators appear on the IE screen to indicate iBrowz content is being viewed or downloaded.

## 4.3. Handheld and Desktop Functionality

This section provides a user-centric description of how the handheld and desktop components will function.

### 4.3.1. iBrowz Installation and 1st Time User Experience

When a Treo 700w user inserts an SD card into their device which contains iBrowz, the iBrowz Installer shall will automatically load and detect whether the iBrowz instance residing on this particular SD card has been registered and configured.

If the installer determines that iBrowz has already been registered and configured, it will simply launch the iBrowz handheld client, and the user will proceed with normal usage of iBrowz.

If the installer determines that iBrowz has not been registered and configured, it will perform the following tasks:

* Insert links to iBrowz in the Favorites database

BACHMANN18

- Launch the registration process by launching the preconfigured Registration Home Page.
- Launch the subscription management page
- Prompt the user for local iBrowz configuration settings such as iMessenger polling schedule, aging rules, and preferred update method (wireless or sync)
- Prompt the user to updated downloaded content

Upon successful completion of the 1st Time User tasks, the iBrowz handheld client will launch and the user will proceed with normal usage of iBrowz.

### 4.3.2. The iBrowz Handheld Client

The iBrowz handheld client will be the preferred starting point for users to access and configure their iBrowz local content. It will be a standard Windows Mobile 5-compatible handheld application, complete with program icon and a Start menu shortcut.

*GB: We need to define the behavior of iBrowz when the SD card is no longer inserted, a different SD card is insert without iBrowz content, or the SD content is missing or corrupted. I am thinking it is valuable from a user standpoint to maintain the Start Menu shortcut for iBrowz even when the card is not inserted, but we may need to install a small applet on the main device in order to at least tell the user they need to insert their card.*

The main screen for iBrowz will consist of the following:

### Title Bar

This will present the name of the app ("iBrowz"), as well as two small icons which will show whether the content being viewed is local to the SD card (iBrowz content), and whether any iMessenger activity is happening. When a page is being viewed which is from the SD card,

*GB: It might be worth considering other icons. Wireless status. Time, etc. Also perhaps the icons could be "live" leading to additional info if tapped.*

### Menu Bar

This will be the standard location for the applications menu system, which is accessed on the Treo 700w by using the left and right menu buttons. The exact menu layout is TBD, but it will at minimum contain shortcut menu items for:

- About iBrowz (goes to about screen with copyright and contact info)
- Home (goes to the root/home page on the SD card)
- Update Content (launches iMessenger update session)
- Registration (goes to the registration page on the SD card)
- Configure (goes to configuration screen)
- Refresh (refreshes the current content view)

Additional menu items may be added which will be specific to the operation of the embedded HTML browser.

*GB: It might be worth considering a "History" list. The way it is now, each time iBrowz is launched, the content will default to the home screen. If the user was*

*previously reading some content deep within a series of web pages this could be annoying to have to find it again.*

**Content Area**

This is the main area of the iBrowz screen, and will serve as the container for the viewing of iBrowz SD card content. Upon launch, this content area will contain an attractively styled/themed background with a welcome message and three large onscreen selectable buttons: "Home", "Update Content" and "Configure".

We also suggest that the main iBrowz screen display the date and time of the last update from iMessenger.

***GB: It is possible that we should simply dump the user into the home page and relegate "Configure" and "Update" to a menu item.***

The "Home" button shall then replace the main screen with the embedded HTML viewer which will display the contents of the root/home page from the SD card. This root page will be pre-created and formatted with links to the content categories currently stored on the SD card. Once within the viewer, navigation/access to SD iBrowz content will be totally managed by the links within the iBrowz content, with the exception of the menu items for "Home", "Configure", etc.  No address bar shall be visible.

Content subscription management is also performed within the content itself, via links to local pages which present a list of currently subscribed and available content and categories.

Note: The ability to render content within the embedded IE browser is described on Microsoft's documentation as "equivalent to that of Pocket Internet Explorer". Note that as of this writing we have not tested this claim and are assuming it will be capable enough to handle a variety of content and mime types consistent with that of PIE.

**Configuration**

If the user chooses Configure, either from the iBrowz main screen, or from the menu system, they will be brought to a configuration screen which offers the user the ability to define several local configuration options which affect the iBrowz handheld client, as follows:

- location of the root content page on the SD card
- name of the root content page on the SD card
- a schedule for how often and when iMessenger should update content (options TBD)
- "Aging" rules. These rules will define for iBrowz/iMessenger rules for when SD content should be deleted, either due to the age of the content, or SD card space restrictions.

The above configuration options will be presented in a local iBrowz application screen and will be stored by iBrowz in a configuration/preferences database on the SD card.

*GB: Note that as part of the iMessenger configuration, an option needs to be there which will accommodate users who do not want wireless iMessenger activity – they will instead get updated content via the Desktop Synchronization agent (see below).*

In addition to these configuration options, the iBrowz SD content will also include a page which allows the user to configure options which affect the amount and kind of content which will be delivered. These selections will be not stored locally on the device, but communicated back to the server as part of the configuration form's POST data.  For consistency sake we may wish to include access to this page from within iBrowz' Configuration screen. Or we can keep the two concepts separate (one is iBrowz application management, the other is content/subscription management)

**User Activity Logging**

Although hidden from the user, the iBrowz application shall create an entry in a log file each time the user requests a different URL (local or remote) from within the iBrowz viewer. The log entry shall consist of a date, time, and full url of the page requested. This log shall grow until such time as it is transferred to the desktop or the host via Synchronization.

**iBrowz About Screen**

Selecting the About iBrowz menu option will display a local iBrowz dialog that displays the iBrowz program icon, copyright information, contact information, and version information.

## 4.3.3. iMessenger Content Updating

The iBrowz system will include a handheld Windows Mobile component which is called iMessenger. iMessenger's responsibilities are as follows:
- Connect and authenticate to the InTouch proxy server either manually or according to a schedule
- Request updated content based on the user's profile and subscriptions
- Download the content as a compressed package to the device's SD card at a predetermined location.
- Unpack the downloaded package
- Deploy the updated content, replacing the existing content
- Identify and remove outdated content from the SD card based on a content manifest supplied as part of the download.

When iMessenger connects to the InTouch proxy server, it will form an http request, which will include a user id, a list of local SD files (manifest) and a file containing subscriptions. If successful, the resulting download will include a new manifest and subscriptions in addition to the new content. Upon receipt of manifest iMessenger will need to delete any local content files which are not in the new manifest.

The downloaded content shall be in "zip" compressed format, and it shall be the responsibility of the iMessenger content extractor to unzip and deploy this file on the card.

The iMessenger component shall perform its activity as a background threaded process, and shall have minimal detectable impact on the performance or responsiveness of the handheld device while it is processing. iMessenger will not display on the screen unless the iBrowz handheld application is running, in which

case if updating is taking place, a title-bar indicator icon will appear which will show that content is being updated.

*GB: Usability testing will need to be performed to help determine the best balance of background activity vs download speed. Naturally the lower priority given the background thread, the longer a download session will take, thus increasing the possibility of problems during the transmission due to coverage or battery issues. This will become a more significant issue as the possibility of larger content downloads is raised by the availability of media as well as a wider array of filtered web sites.*

We suggest that for auditing and debugging, iMessenger shall make entries in a log which track its activity as well as the results of the activity (date, time, success, failure, if failure an error code, bytes downloaded, duration of session, etc)

*GB: We will need to determine how iMessenger should handle error conditions. For example, could not connect wirelessly (due to coverage or other issue). Should the user be immediately notified of problems encountered by iMessenger? Or should it silently log the issue? When iBrowz next launches, we should tell the user if there were problems in some way....*

Note that the package extraction/deploying phase of iMessenger's job will in fact be a separated function which can be activated either at the tail end of an iMessenger download OR upon completion of a synch of new content from the desktop.

### 4.3.4. The iBrowz Synchronization Agent (iMessenger Desktop)

A Windows Desktop component shall be developed which will act as an alternative content retrieval and synchronization option for users/devices which cannot or prefer not to download iBrowz content through the device's wireless connection.

The iBrowz Desktop component will need a minimal application screen which offers the user the ability to set configuration options similar to those described in the device-centric version of iBrowz, including download location, and update frequency.

The Desktop component will include a version of iMessenger built as a Windows-compatible binary. This component will perform essentially the same actions described above for iMessenger up until the point where the downloaded package is stored on the desktop. iMessenger will not at that point extract the actual content. Instead, it will leave the compressed package available as-is for synch to the handheld, at which time the package extractor component of iMessenger on the handheld will expand and deploy the content.

*GB: Confirm that the desktop's connection to the proxy server should be on a scheduled timetable, and not tied to ActiveSync connection.*

When an ActiveSync connection is made between the handheld and the desktop, if there is new/updated content available, it will be transferred to the handheld. In addition, during this activity any logs present on the handheld shall be uploaded to the desktop with the device versions truncated at that time.

*GB: What is the plan for packaging and uploading of these logs to the InTouch server?*

*GB: Need to detail the rules of authentication, the concept of registration and user id, the http protocol to be used, etc.*

# 5. Development Plan

InTouch has outlined a set of three rollout and pre-release milestones which they would like to achieve. The following describes the level of functionality which is expected to be available/demonstrable at those points.

### 5.1. "Strong Demo" (Feb 10 completion for use at tradeshow week of Feb 12th)

This version of the program will be a demonstration prototype which supports this sequence:

1. User inserts SD card
2. Autorun application automatically launches and presents iBrowz main screen
3. The main screen will contain an attractive graphic presenting the user with large graphic buttons for home page, configuration, and content updating
4. Selecting home page will launch into the iBrowz embedded HTML viewer and display the home page which was pre-configured on the SD card.
5. The demonstrator will be able to show the existing content on the SD card, comment on how fast access is, no wireless access needed to browse, etc. An indicator on the title bar will show that the content is "iBrowz generated"
6. Now the demonstrator will choose a button or menu which will manually initiate an iMessenger content update
7. iMessenger shall launch as a foreground module and retrieve a predefined .zip file at a specific URL on the Proxy Server. No authentication or other http protocol will be implemented at this time.
8. iMessenger will download the zip file and then decompress/extract it to the proper content location on the card
9. Upon completion of the download, the HTML content will either auto-refresh or may need to be manually refreshed. At this point the new content will be visible on the viewer.
10. At the end of the demo, the demonstrator will select a special demo menu option to "restore to default". This will restore iBrowz to the original pre-stored SD card content to prepare for the next demonstration.

In order to support this demonstration scenario in the short time available, we will quickly develop and assemble the following project components up-front:

- SD Card autorun Installer
- Handheld iBrowz application basic "shell"
- Embedded HTML viewer
- Simple iMessenger implementation (only runs as foreground, downloads hard-coded file from hard-coded URL, no authentication, etc)
- Zip file extractor

Aside from the handheld items to be developed above, the demo will depend on the following being available:

- Icons/graphics for iBrowz and main app screen
- Proxy Server up and available

- Zip file on proxy server at fixed URL
- Preliminary zip file for testing

### 5.2. 1st Functional Release (est 3/30 completion)

- Authentication and server protocol
- Refine installer/initial setup
- Expand iMessenger implementation
- Refine zip/compression/package extraction
- Logging
- Refine / improve viewer integration
- Refine / enhance UI shell
- Bugs and other refinements

### 5.3. 2nd Functional Release (est 4/30 completion)

- Implement sync functionality
- Bugs and other refinements

### 5.4. Final Release (est 6/15 completion)

- Bugs and other refinements

## 6. Project Cost Estimate

Based on the functionality described in this statement of work, we estimate a development cost of $72,000.

Bachmann reserves the right to evaluate and make changes to the project cost based on changes to the scope or functionality of the product. Any such changes shall be agreed to in writing by both parties.

## 7. Project Milestone and Payment Schedule

The development schedule proposed by InTouch represents an aggressive target and requires that Bachmann apply significant development resources to the project immediately.

We propose the following milestone and payment schedule

| Milestone | Estimated Date | Payment |
|---|---|---|
| Project Engagement | Jan 29, 2007 | 20% ($13,600) |
| "Strong Demo" | Feb 10 – Feb 12 2007 | 20% ($14,600) |
| 1st functional release | March 30, 2007 | 20% ($14,600) |
| 2nd functional release | April 30, 2007 | 20% ($14,600) |
| Delivery of final product release | June 15, 2007 | 20% ($14,600) |

Milestone Notes:

1. Milestone #4, which represents the 2nd Functional Release, shall be "feature complete". Feature complete is defined as having all of the functionality described in

the Statement of Work reasonably demonstrable. Upon delivery of Milestone #4, milestone payment #4 shall be payable to Bachmann.

2. Upon receipt of the Feature Complete release, InTouch shall have two weeks to test the release and deliver to Bachmann a complete list of Defects it has found from testing. A defect is defined as behavior which deviates from the Statement of Work, or an instance where a program function causes an unexpected or abnormal application termination.

3. Upon delivery of the Defect List, Bachmann shall review the list. InTouch shall then promptly review and prioritize with Bachmann any items for which corrective actions are necessary, and establish an agreeable timeframe for completion of the items.

4. Milestone #5 representing the completed iBrowz client application matching the SOW, shall incorporate the completed items from the Defect List. Upon delivery of this release, the 5th and final milestone payment shall be payable to Bachmann.

The foregoing assumes that the Statement of Work is current and has been updated to reflect the most currently agreed-upon design and functionality for the iBrowz application. Any and all changes to the SOW during the project itself shall be reviewable by Bachmann and may incur changes to the development schedule and/or development cost associated with the project.

Glenn Bachmann (GB)
e-Signed on 2007-03-08 07:22AM EST
glenn@bachmannsoftware.com

Page 17 of 17

Document Integrity Verified
Transaction Number: XSZF3A6HY44F

Send. Sign. Done.

EchoSign. Signed: 2007-03-08

BACHMANN25

**EXHIBIT B**



Exhibit B: Product Manager Role



# InTouch Product Manager Role
**Glenn Bachmann**
**Bachmann Handheld Solutions**
**Revision Date: 04/23/2007**

Separately from the iBrowz application development services described in Exhibit A of this Agreement, InTouch has requested that Bachmann Handheld Solutions provide services the role of iBrowz Product Manager. This Exhibit describes the Product Manager role and the business arrangement between Bachmann and Intouch.

## Job Description

The Product Manager role shall consist of any ongoing activities normally associated with a Software Product Manager, including but not limited to the following:

- Work with CEO and management to define, create and maintain Product Roadmap for iBrowz
- Create and maintain Product Functional Specification for iBrowz
- Perform Competitive Product Analysis
- Provide InTouch management with mobile/wireless market guidance and strategic guidance
- Participate in regular conference calls with management and project personnel regarding product design and direction
- Attend and participate in monthly on-site meetings
- Attend selected trade shows and/or partner/customer meetings (upon InTouch request)

## Assumptions

InTouch recognizes that the success of the product manager role depends heavily on access to InTouch management as well as the communication of product requirements, strategy and vision from the CEO and management upon request from the Product Manager.

## Budget

A pre-approved weekly budget of 15 hours shall be set, not to exceed 65 hours in any given month. This budget shall cover the above activities, with the exception of a) on-site meetings and b) tradeshow/customer meetings, which shall be billed separately and shall include reasonable expenses for travel, lodging in addition to hours worked during the travel period.

InTouch may request additional Product Manager hours above and beyond this weekly budget. If Bachmann agrees to provide the additional hours, those hours shall be approved and appended to the budgeted hours for that month.

**Accounting, Billing and Invoicing**

All Product Manager hours shall be billed at the rate of $125 per hour. Product Manager hours shall be tracked and accounted for on a monthly basis. On the last calendar day of each month, Bachmann shall deliver to InTouch an invoice for Product Manager work, along with a report detailing the hours spent by day for that month. Invoices shall be payable by InTouch on a net 30 basis.

BACHMANN27

EXHIBIT C

## DEVELOPMENT AGREEMENT

This Development Agreement ("Agreement"), dated as of the 24th day of October 2007, by and between intouch group ("Client"), a California corporation, and Bachmann Software & Services, LLC, a New Jersey limited liability company ("Bachmann").

## RECITALS

WHEREAS, Bachmann is in the business of providing software development services to third parties; and

WHEREAS, Client and Bachmann desire that Bachmann provide certain software development services to Client;

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, the parties hereto agree as follows:

1.   **General Services and Expectations**

Bachmann agrees to provide mobile software development services, in accordance with the provisions set forth herein. It is expected that Bachmann shall use all best efforts and professional practices to deliver bug-free code, pre-tested by Bachmann's team, and QA tested by InTouch, with the completion of each development cycle. Additionally, in the interest of maintaining an uninterrupted flow of work on Client's project, Bachmann agrees to insure that there are at least two engineers on Bachmann's team at all times who are proficient in all aspects of the mobile software development effort in progress for Client. The designated engineers available for this purpose as of the date of this agreement are as follows (Bachmann to specify below):

    1) _____
    2) _____

1a    **Sprint Estimating Procedure**

It is envisioned in this contract that the services provided by Bachman will be refined and specified in a series of short development efforts between intouch and Bachman called "Sprints". Sprints will typically last 2-3 weeks. At the beginning of each Sprint, Bachman and the intouch development team will discuss the efforts ahead in a "SCRUM Planning Meeting". At the request of Client team, Bachman will attend these meetings in person. Specific requirements for the Sprint period, along with desired dates for completion, and detailed acceptance criteria will be

BACHMANN1

defined in writing by Client. Upon review of **the** requested list of tasks, Bachmann shall provide a fixed-cost proposal and a commitment to complete the requirements by an agreed-upon delivery date. Upon acceptance of the proposal by Client, each Sprint-specific set of requirements and associated fixed-cost proposals shall be incorporated as sequential Exhibits to this agreement (Exhibit A, Exhibit B, and so on...)

The "not to exceed" cost will include:
- defining functionality with intouch (where applicable),
- creation and delivery of documentation at the end of each Sprint*,
- construction of device side code,
- meetings with intouch staff,
- resolution of bug issues found to be directly related** to new features.

For purposes of this agreement:

* Source code and other related deliverable documentation shall be prepared in a consistent manner that meets or exceeds current InTouch documentation standards. InTouch's documentation standards shall be defined internally by the development team, published to the company as guidelines, and attached to this agreement for reference (exhibit _____). If at some point in the future additional documentation requirements may be required to meet a specific industry standard, InTouch shall either request a cost proposal from Bachmann for the documentation enhancements, or Bachmann shall provide reasonable support to InTouch's designated technical writer.

**"Directly related bugs" are reproducible bugs which prevent a feature from meeting the acceptance criteria.

Changes in Scope: Any change in the requirements or scope of work introduced by either Bachmann or Client during an ongoing Sprint shall first be mutually agreed upon as a Change of Scope by both Bachmann and Client, along with any associated impact on time and cost.

1b.    Method for Managing Device Side Source Code

It is critical to the successful management of the mobile software development effort that Client's mobile development engineers and Bachmann's engineers have concurrent access to the most recent version of the device source code. Upon the establishment of a central code repository at InTouch's offices, Bachmann shall transition its source code over to InTouch's code repository. Thereafter, all code developed by Bachmann shall be stored at InTouch's repository.

BACHMANN2

Storage of code written by Bachmann at InTouch's code repository does not in any way imply InTouch's ownership of any source code created during any Sprint for which InTouch has not paid Bachmann.

### 1c.   Invoicing.

At the end of the Sprint upon Acceptance of the completed requirements defined for the Sprint, Bachmann shall submit an invoice for the work performed during the Sprint. Upon payment source code ownership is transferred.

### 1d.   Acceptance

Upon delivery of a final build for the completed Sprint, Client shall provide notification in writing, within three (3) business days of delivery, reasonably identifying defects (defined in Section 1a as Directly Related Bugs), and describing the manner in which Bachmann shall cure the defect.  Upon receipt of such notification, Bachmann shall have an opportunity to cure the defect within five (5) working days after receipt of notice.  If Bachmann is unable to cure the defect within said time period then Client may allow Bachmann an additional opportunity to correct the defect to render it acceptable to Client. Bachmann shall not invoice Client for the Sprint until Acceptance. If Bachmann is still unable cure said defects within the allotted time period, Client may terminate the agreement as described in the section "Termination".

### 1e.   Payments.

In order for Bachmann to allow InTouch to have real-time access to current ongoing source code, payments against submitted invoices must be made in a timely manner. Payments are due no later than Net 15 from the receipt of invoice.

### 2.   Fees and Expenses

Client shall pay Bachmann the fees and expenses described on each purchase order as requested by the invoice.  No other fees and expenses shall be charged to or payable by Client in connection with the Services, except solely that Client shall reimburse Bachmann for any extraordinary out-of-pocket expenses not currently contemplated by the parties and which Bachmann incurs in connection with the Services after obtaining Client' prior written approval for such extraordinary expenses.  Bachmann shall submit timely invoices detailing such expenses and shall submit receipts for all such expenses.

### 3.   Work for Hire

All right, title and interest in and to all work product created by Bachmann and its employees, agents and subcontractors, including, without limitation, software code (source code and object code), documentation, studies, specifications, consumer and

BACHMANN3

product data, new products or parts, plans, ideas, inventions, research, designs, enhancements, graphic and electronic productions, engineering results, and all directly related know-how, technical information and trade secrets, and any other matters and/or materials created, compiled or developed by Bachmann in connection with the Services or provided to Client by Bachmann in connection with the Services (collectively, the "Materials") will for all purposes be exclusively vested in Client.

Bachmann acknowledges that the Materials are "work made for hire", and to the extent Client does not become the exclusive owner of the Materials by operation of law, hereby grants and assigns to Client all right, title and interest it may have in and to the Materials, without reservation or restriction, including but not limited to, the right to use, patent, copyright, trademark, market, license, release, sell, distribute, promote, advertise and otherwise exploit all or part of the Materials, and any other products made or processes derived there from, and to refrain from doing any or all of the foregoing.

In furtherance thereof and at no charge to Client, Bachmann agrees: (i) upon Client's written request, to communicate and assign (and will require all of its employees, agents and subcontractors to communicate and assign) to Client all right, title and interest in and to the Materials, including without limitation, all patents, copyrights, trademarks, trade secrets, inventions and discoveries developed in the performance of the Services, (ii) to execute and deliver to Client such additional documents as Client reasonably requests as necessary to more fully vest in Client all right, title and interest in the Materials and to evidence that no other person has any claim thereto, and (iii) to require all personnel working on the provision of the Services hereunder, to enter into a written agreement with Bachmann giving Bachmann the full right, title and interest in and to all the results, tangible and intangible of such work, with Client being a stated third party beneficiary to such agreement and authorized to enforce such agreement directly.

Bachmann shall obtain releases, licenses, permits or other authorizations required or appropriate for the use by Client on a worldwide basis on any media of all photographs, copyrighted materials, artwork or any other property or rights belonging to third parties obtained by Bachmann for use in performing Services for Client.  The provisions of this paragraph shall survive the termination or expiration of this Agreement.

5.    **Representations, Warranties and Covenants**

Bachmann hereby represents and warrants to Client that as of the date hereof and at all times while providing the Services and while any of its obligations hereunder remain in effect, that it has full legal capacity, right and authority to enter into this Agreement, provide the Client with the assignments and rights provided for herein (and has written enforceable agreements with all persons necessary to give it the rights to do the foregoing and otherwise fully perform this Agreement) and to provide the Services hereunder without violation of or conflict with any other agreement or instrument to which it is a party or by which it, the Materials or the Services may be bound or subject.

BACHMANN4

Except as set forth herein and in Exhibit A with respect to the Services, neither Bachmann nor Client makes any representations or warranties of any kind specifically disclaiming any warranties of merchantability or fitness for a particular purpose. In no event shall either party be liable to the other party for any special, incidental (other than direct) or consequential damages or lost profits even if advised of such fact in advance.

6.   **Indemnification**

Bachmann hereby agrees to indemnify, defend, and hold Client and its successors, assigns, owners, officers, directors, employees, shareholders, representatives, and agents harmless from and against any and all claims, liabilities, losses, costs, damages or expenses (including reasonable attorneys' fees, expert witness fees, legal expenses and costs) lawsuits and other judicial proceedings whether in contract, tort, or both arising from or in any manner connected with (i) Bachmann's provision of the Services, (ii) a breach by Bachmann of its representations and warranties hereunder, or (iii) any action brought by a third party asserting infringement of copyright, patent or trade secret or other third party proprietary rights by the Services or Materials. The provisions of this paragraph shall survive the termination or expiration of this Agreement.

7.   **Confidentiality**

Bachmann acknowledges and agrees that Client is entitled to prevent the disclosure of Trade Secrets. Bachmann agrees, for itself and each person providing Services hereunder on behalf of Bachmann, at all times while providing Services for Client hereunder and at all times thereafter to hold in strictest confidence, limit access to, and not to disclose or allow to be disclosed to any person, firm or corporation, and not to use, except as may be necessary in rendering Services to Client, whether directly or indirectly, any Trade Secrets, without the prior written consent of a duly authorized representative of Client. For purposes of this Agreement "Trade Secrets" shall include (i) all information provided by Client to Bachmann in connection with the Services, and (ii) all Materials. The provisions of this paragraph shall survive the termination or expiration of this Agreement.

8.   **Governing Law**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of California without reference to the law of conflicts of laws thereof.

9.   **Independent Contractor Status**

The parties intend that Bachmann shall act as an independent contractor in performing the Services under this Agreement. Bachmann has no express, implied or apparent authority to make commitments on behalf of Client pursuant to this Agreement. Bachmann shall be responsible for all taxes arising from the development fees paid to Bachmann hereunder. Bachmann acknowledges and agrees that, as an independent contractor of

BACHMANN5

Client, it is not entitled to share in any employee benefits of Client whether pursuant to this Agreement or otherwise, nor shall it be entitled, except as specifically provided herein, to participate in any plans, programs or arrangements offered, or which may in the future be provided, by Client to its employees. Bachmann shall be solely responsible for all wages, salaries, benefits of its employees, and for all employment and self-employment taxes and for insurance coverage.

10.    **Assignability**. It is understood that the Services provided hereunder are to be provided by Bachmann. Therefore, Bachmann may not assign, transfer or sell its rights under this Agreement or delegate its duties hereunder without Client's prior express written consent. Any attempted assignment or delegation without such consent shall be void and without effect.

11.    **Notices**

All notices or communications hereunder shall be in writing, addressed as follows:

        To Client:

                intouch group
                1003 Camelia Street
                Berkeley CA  94710
              .  Attn: Ben Camgros

        To Bachmann:

                Bachmann Software & Services, LLC
                270 Sparta Avenue, Suite 104-318
                Sparta, New Jersey 07871
                Attention:  Glenn Bachmann

All such notices shall be conclusively deemed to be received and shall be effective, (a) if sent by hand delivery or courier service, upon receipt, (b) if sent by telecopy or facsimile transmission, upon confirmation of receipt by the sender of such transmission or (c) if sent by registered or certified mail, return receipt requested, on the fifth day after the day on which such notice is mailed. Either party may change the address provided for that party above by giving notice to the other party in the manner prescribed in this Section.

12.    **Termination**

Either party shall have the right to terminate the Services Agreement with or without cause . In the event that Client chooses to terminate the agreement the Consultant will be given a minimum of thirty (30) days prior written notice. In the event that the Consultant chooses to terminate the agreement he will give ninety (90) days prior written notice. Upon such notice of termination (i) the parties shall cooperate with each other to wind down, and to the extent applicable execute an orderly transition the Services and the Materials to intouch or a third party, (ii) Client shall immediately pay to Bachmann any

BACHMANN6

amounts not previously paid for the Project Fee and all additional compensation, if any, then due to Bachmann for Services rendered through the date of termination, (ii) all Materials (as defined) and any other material prepared, used or delivered by Client to Bachmann or in Bachmann's possession or control, whether or not approved by Client, shall become and remain Client' property, and Client may use such Materials as Client deems necessary or desirable, without any obligation or responsibility to Bachmann, (iii) Bachmann shall immediately deliver to Client, or if so instructed by Client, destroy all tangible and electronic embodiments of Trade Secrets (as defined) then in its possession or control or for which Bachmann is responsible, whether written or contained on any tape, disk or other storage or retrieval medium, including all copies and derivative material.

During the transition period following Termination, Bachmann will work under the direction of InTouch's project manager. After the final day of work following the termination notice, Bachmann shall send a final invoice to the Client for the work performed during the Termination period. This invoice shall be payable within 15 days, in accordance with section 1e "Payments".

13.      **Entire Agreement**

This Agreement represents the entire agreement of the parties, and shall supersede any and all previous contracts, arrangements or understandings between Client and Bachmann, with respect to the subject matter hereof. This Agreement may be amended at any time by mutual written agreement executed by the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CLIENT

By:_____

   Name: Joshua D. Kaplan
   Title: President, Intouch Group, Inc.

BACHMANN SOFTWARE AND SERVICES, LLC

By:_____

Send. Sign. Done. ————————————— EchoSign. Signed: 2007-10-25 ————

BACHMANN7



Name:  Glenn Bachmann
Title:    Principal

Glenn Bachmann (GB)
e-Signed on 2007-10-25 04:37PM EDT
glenn@bachmannsoftware.com

Document Integrity Verified
Transaction Number: 73JL3U49625V
EchoSign. Signed: 2007-10-25

Send. Sign. Done.

BACHMANN8